ALDEN COAL MINING COMPANY, INC., Appellant, v. C. L. AMOS COAL COMPANY, Respondent.

First Department, June 11, 1920.

Principal and agent — contract with selling agent construed — rescission — when failure to make payments does not justify rescission — questions of law and fact — duty of court to draw conclusions from undisputed facts — question for jury.

In an action for a breach of a contract whereby the plaintiff became the selling agent of the defendant for coal the contract examined, and *held*, not to require the plaintiff to take a proportionate amount each month of the total amount that the defendant agreed to furnish for the year.

Even though the plaintiff was required to make a settlement on a certain date during each month its failure to do so once under the facts of the case did not justify the defendant in rescinding the contract.

There being no dispute as to the facts relating to the monthly payments and the time thereof it was for the court to determine whether or not the defendant was justified in rescinding the contract for a failure to settle according to the terms thereof.

As there was a material conflict in the evidence as to whether the provision relative to the right of the plaintiff to renew at the end of the first year was placed in the contract by the defendant after its execution, there was a question for the jury.

APPEAL by the plaintiff, Alden Coal Mining Company, Inc., from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 25th day of July, 1919, upon the verdict of a jury, and also from an order entered in said clerk's office on the 21st day of July, 1919, denying plaintiff's motion for a new trial made upon the minutes.

*Grant C. Fox* of counsel [*Louis H. Rowe*, attorney], for the appellant.

*Frank J. O'Neill*, for the respondent.

PAGE, J.:

The action is brought to recover damages for the alleged wrongful cancellation of the following contract:

"NEW YORK, *March* 20*th*, 1915.
" ALDEN COAL MINING COMPANY,
            "# 1 Broadway,
                  " New York City:

" DEAR SIRS.— Referring to the coal mined and shipped by the Carnwath Coal Company, of Carnwath, Clearfield County, Pa., beg to advise that this Company has the exclusive sale of all the coal mined and shipped by the Carnwath Coal Company, and has heretofore, and still has an office in Syracuse, N. Y., and also at No. 1 Broadway, New York City, for the purpose of selling the same. We also beg to confirm arrangement made with you to-day to the effect that we desire to give up the present office of the C. L. Amos Coal Company at No. 1 Broadway, New York City, and hereby agree to employ the Alden Coal Mining Company for a period of one year from the date hereof to act as our agent, for the purpose of selling said coal, we agreeing to furnish and ship to the Alden Coal Mining Company during said period a minimum tonnage of 50,000 tons, with the understanding that you are to sell the same and net us at least $1.20 per gross ton for said coal f. o. b. at the mines, and you are to receive as full compensation for your services 10% of the selling price of said coal, with the understanding, however, as aforesaid, that the minimum price which we are to receive therefor is $1.20 per gross ton f. o. b. at mines. In other words, in the event your selling price is $1.25, you are to receive Five Cents a ton commission, in lieu of the 10% above set forth, and net us $1.20.

" It is understood that you are to pay us on the 20th day of each month for all coal furnished and shipped during the preceding month.

" In the event you are able to procure orders or contracts for said coal during said period for a tonnage in excess of 50,000 tons, it is understood that unless you can net us at least $1.25 per gross ton, that said orders and contracts are to be submitted to us for approval prior to the making thereof. In the event that you sell during said period at least 50,000 tons of said coal upon the terms and conditions above set forth, it is understood that you are to have the right to elect to renew this contract from year to year for a period of 3 years.

" It is also understood that the New York business of the

C. L. Amos Coal Company, consisting of unfilled orders and contracts, certain future business and the bunkering business, is to be handled through said Company by you in the following manner: You are to place the name of the C. L. Amos Coal Company on the door of your present office, or procure the adjoining room, continue its name in the telephone book, have telephone facilities in your office for said Company, and take charge of filling and carrying out the present orders and contracts of its New York office, to which office it shall at all times have access, and it agrees to pay you as full compensation therefor one-half of the net profits realized out of said business, it being understood that it is to pay no office rent, but in the event that A. D. Scott is employed, each is to pay one-half of his salary.

" The books and accounts of such business is [*sic*] to be kept in its Syracuse office at our expense, and a report of the net profits is to be made to you on the 20th of every three months, at which time the profits are to be divided, it being understood that the books and accounts at our office, and the books, order blanks, or other papers at your office, shall be subject to inspection of each of us at any time.

" The New York office of the C. L. Amos Coal Co. and the Alden Coal Mining Co. shall have the exclusive sale of the coal in the following territory: State of New York, south of Albany; States of Connecticut and Rhode Island, and the State of New Jersey, east of Trenton, and with the right to sell coal in Trenton.

" Yours very truly,

" C. L. AMOS COAL CO.,

C. L. Amos, *Prest.*

" We hereby agree to the following terms and conditions.

" ALDEN COAL MINING CO.,

" W. S. Alden, *Prest.*

" This contract to become effective May 1st, 1915.

" W. S. A.                        · C. L. A."

The evidence shows that the plaintiff entered upon the performance of the contract and complied with all the preliminary terms and conditions; that it hired an adjoining room to the suite occupied by it at No. 1 Broadway, and retained

in its employment A. D. Scott and commenced to solicit orders for the defendant's coal. The evidence further shows that the market for coal from May until October was very dull, and that the defendant, at plaintiff's request, made concessions in price and accepted orders and shipped coal below the contract price; that beginning with October the demand for coal increased, and owing to various causes, principally car shortage and freight embargoes and strikes at the mines, the price of coal advanced and there was a large demand. During this latter period the defendant refused to accept a number of orders that the plaintiff submitted and repeatedly informed the plaintiff that it was having difficulty in filling the contracts that it had made with its customers. This led to a great deal of correspondence back and forth, and this condition seems to have continued down to the time of the alleged cancellation of the contract, for on February 4, 1916, the president of the defendant wrote to the president of the plaintiff as follows: " I am perfectly willing to let you have whatever free coal we have above our contracts, but we do not feel that you are entitled to anything except what free coal we have to spare.  *  *  *  Whatever free coal we have we will be glad to have you sell. As soon as we have some free tonnage at the mines I will let you know, but the way the output is to-day it does not look very much as if we were going to get out more than we have to have for our contracts. We are making every effort to increase our output but between the scarcity of labor and the shortage of car supply we are not making much headway at present."

The defendant contends that the plaintiff was obligated to take a proportionate amount of the 50,000 tons during the summer months, but this contract was not a contract for the sale of that specified quantity to the plaintiff deliverable in equal monthly installments. The defendant knew, and the contract provided, that the plaintiff was to sell the coal to others and was to order and pay for the coal in accordance with the terms of the contract, which was to pay on the twentieth of each month for all coal furnished and shipped during the preceding month. The defendant also claims that the failure to perform the contract on its part in the acceptance and shipment of orders received from the plaintiff by reason

of car shortage, strikes and freight embargoes is excused, and yet insists that the plaintiff was required to sell a proportionate amount of the 50,000 tons, notwithstanding its failure to accept the orders and ship the coal. The plaintiff makes no point of the defendant's failure to deliver, except in so far as the same would have a bearing upon its measure of damage by showing that it had performed on its part, except as it was prevented by the defendant's failure to perform.

On February 21, 1916, the defendant wrote the plaintiff the following letter:

"SYRACUSE, N. Y., *February* 21, 1916.

" ALDEN COAL MINING CO.,

"1 Broadway,

"New York City:

" GENTLEMEN.— We are in receipt of your letter of the 19th inst. enclosing order for 1000 tons of Carnwath to apply on contract tonnage.

" In view of your failure to comply with contract of March 20, 1915, and with our written demand of February 3, 1916, in which we requested that on or before February 20, 1916, you furnish us with a statement and pay us all moneys received by you, less your commission on the sale of Carnwath coal from May 1, 1915, until February 1, 1916, I think that you have forfeited your rights under said contract and we no longer consider the same binding upon us and, therefore, refuse to furnish you any further coal thereunder.

" It is our further contention that your failure to render us a statement showing the names of the party or parties to whom you sold Carnwath coal, the purchase price and the respective dates of such sales and the moneys received therefor in accordance with our said request of February 3, 1916, and with the terms of said contract, is a further breach of said contract and is a further ground for cancelling this contract.

" Very truly yours,

" A. A. COSTELLO,

" *Secty.*"

At the time this letter was written the only amounts that were outstanding were three items: The first was for nine or ten carloads of coal loaded in the boat *Nevada.* The sale of

this coal was made on or about January 20, 1916. On January twenty-second Mr. Scott wrote a letter to the defendant, in which he stated that the coal was sold at four dollars and seventy-five cents a ton. On January twenty-seventh the defendant sent to the plaintiff an invoice for this coal at that price, deducting the commission of ten per cent. On February third the defendant wrote the plaintiff, stating that they had made a mistake in the invoices in allowing the plaintiff only ten per cent, whereas under the terms of the contract the plaintiff would have been entitled to fifty per cent of the profit and inclosed a credit memorandum correcting this error. The plaintiff thereupon wrote to the defendant, stating that a mistake had been made in the sales price of this coal; that it should have been four dollars and sixty cents per ton instead of four dollars and seventy-five cents and asking them to correct the invoices and return them promptly. This led to some correspondence, and the corrected invoices were not returned until February twenty-eighth, when the defendant wrote correcting the mistake and inclosing a credit memorandum, and the plaintiff the same day sent a check for $1,444.07, the amount of the corrected memorandum. The defendant claims that the payments should have been made on the twentieth of February, and this is the most serious breach of the contract that is urged for the justification of cancellation. The facts were not disputed.

The other two items were for two cars amounting to $266.63 and for two other cars amounting to $260.34, shipped from the mines during the month of January, 1916, but not sold and delivered by the plaintiff until February sixteenth and seventeenth, respectively. The defendant's claim is that under the contract all coal shipped from the mines was to be paid for by the plaintiff on the twentieth of the succeeding month, while the plaintiff's claim is that under the contract it was not required to pay for the coal until it had sold and shipped the coal. The latter had been the course of dealing between the parties throughout the term of the contract, and would seem to be the only method that could have been pursued because the amount the plaintiff was to pay could not be ascertained until after the sale was made, as the deduction for commissions or a proportionate amount of the profit

could not be ascertained until after the goods were sold and billed to the purchaser.   Therefore, in my opinion, the plaintiff's contention in regard to these two items which were paid on the twentieth of March is correct, and there was no default on its part; but even assuming that the defendant was correct and that the plaintiff was required under the contract to make these payments on the 20th of February, 1916, its failure to do so would not entitle the defendant to rescind the contract.

In a very recent case in the Court of Appeals (*Helgar Corporation* v. *Warner's Features*, 222 N. Y. 449, 453) Judge CARDOZO has laid down the rules which now govern the right to rescind a contract for failure to pay for one or more installments:   "The vendor who fails to receive payment of an installment the very day that it is due, may sue at once for the price.   But it does not follow that he may be equally precipitate in his election to declare the contract at an end (Williston, p. 823; *Beatty* v. *Howe Lumber Co.*, 77 Minn. 272, and cases there cited; *Graves* v. *White*, 87 N. Y. 463, 466). That depends upon the question whether the default is so substantial and important as in truth and in fairness to defeat the essential purpose of the parties.   Whatever the rule may once have been, this is the test that is now prescribed by statute.*   The failure to make punctual payment may be material or trivial according to the circumstances.   We must know the cause of the default, the length of the delay, the needs of the vendor, and the expectations of the vendee.   If the default is the result of accident or misfortune, if there is a reasonable assurance that it will be promptly repaired, and if immediate payment is not necessary to enable the vendor to proceed with performance, there may be one conclusion. If the breach is willful, if there is no just ground to look for prompt reparation, if the delay has been substantial, or if the needs of the vendor are urgent so that continued performance is imperilled, in these and in other circumstances, there may be another conclusion.   Sometimes the conclusion will follow from all the circumstances as an inference of law to be drawn

---

* See Pers. Prop. Law, § 126, subd. 2, as added by Laws of 1911, chap. 571.— [REP.

by the judge; sometimes, as an inference of fact to be drawn by the jury."

Where there is no conflict in the evidence and no dispute about the facts relating to these installments and the time of their payment, there remains only an inference of law which must be drawn by the court and not by the jury. (*Jerome* v. *Queen City Cycle Co.*, 163 N. Y. 351, 357; *Wenzel* v. *Ryan Construction Corporation*, 169 App. Div. 357, 363; affd., 223 N. Y. 610.)

Applying the tests above laid down to the facts in the case under consideration, it is very evident that the court should have decided as a matter of law that there was not a sufficient ground for a rescission of the contract on the part of the defendant.

The further question is raised as to the right of the plaintiff to a renewal of the contract for a period of three years. The facts in this regard are that when the contract was dictated, the clause in regard to renewal read as follows: " In the event that you sell during said period at least 50,000 tons of said coal upon the terms and conditions above set forth, it is understood that you are to have the right to elect to renew this contract from year to year for a period of     years."

When the contract was signed this blank was not filled, and the testimony is conflicting concerning the time when the figure " 3 " was inserted in the blank space and by whom. The plaintiff's version is that the matter was discussed at the time the contract was drawn, the plaintiff desiring the right of renewal for five years, and the president of the defendant stating that he would only make a contract for one year, and that he desired to consult some other officers of the company before agreeing to renew for any definite term, and, therefore, the term of renewal was left blank; that thereafter, on the 15th of April, 1915, the presidents of the two corporations met in the office of the plaintiff and signed the contracts without filling in this blank, although there was written in before signature the provision that the contract was to become effective May 1, 1915. The plaintiff's president testified that thereafter, in reading over the contract, he discovered that the blank had not been filled in, and met the defendant's president at the mines and called his attention to the omission,

and that the defendant's president thereupon inserted the figure " 3 " in the blank. This is denied by the defendant's president, who states that he never agreed to any definite term of renewal, and that it was his understanding that the option to renew rested entirely upon the condition of sales each year; that if the plaintiff had sold 50,000 tons each year he would have been willing to renew the same from year to year, but not otherwise. There was some testimony tending to corroborate the testimony of the plaintiff's president and some the denial of the defendant's president that he wrote the figure " 3 " in the contract. This, therefore, presented a question of fact for the determination of the jury, and there must be a new trial.

The judgment and order should be reversed and a new trial granted, with costs to the appellant to abide the event.

CLARKE, P. J., LAUGHLIN, SMITH and MERRELL, JJ., concur.

Judgment and order reversed and a new trial ordered, with costs to appellant to abide event.